## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MICHAEL D. HAMM,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00023 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | By: PAMELA MEADE SARGENT |
| **Acting Commissioner of Social** | ) | United States Magistrate Judge |
| **Security,** | ) | |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Michael D. Hamm, ("Hamm"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hamm protectively filed an application for DIB[2] on July 2, 2019, alleging disability as of July 31, 2011, due to knee problems; problems with both shoulders; neck problems; back problems; depression; anxiety; post-traumatic stress disorder, ("PTSD"); and anger. (Record, ("R."), at 187-88, 280.) The claims were denied initially and on reconsideration. (R. at 119-21, 125-27, 130-37.) Hamm requested a hearing before an administrative law judge, ("ALJ"). (R. at 138-39.) A hearing was held on November 5, 2020, at which Hamm was represented by counsel. (R. at 42-79.)

By decision dated November 23, 2020, the ALJ denied Hamm's claim. (R. at 18-37.) The ALJ found Hamm met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013.[3] (R. at 20.) The ALJ found Hamm had not engaged in substantial gainful activity since from the alleged onset date of July 31, 2011, through his date last insured of December 31, 2013. (R. at 20.) The ALJ determined Hamm had severe impairments, namely, left shoulder partial

---

[2] Hamm previously filed an application for DIB September 27, 2016, alleging disability as of July 1, 2013. (R. at 80-81, 183-84.) This claim was denied the Social Security Administration on January 25, 2017. (R. at 111-14.) It does not appear Hamm pursued this claim any further. At the hearing on Hamm's current DIB claim, counsel asked that the initial claim be reopened, and it appears that the ALJ did so. (R. at 46.)

[3] Therefore, Hamm must show he was disabled between July 13, 2011, the alleged onset date, and December 31, 2013, the date last insured, to be eligible for DIB benefits.

rotator cuff tear and impingement; right shoulder degenerative joint disease and impingement; status-post right knee anterior cruciate ligament, ("ACL"), repair; generalized arthritis; degenerative disc disease; diabetes mellitus; obesity; anxiety disorder; depression; and PTSD, but he found Hamm did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 through the date last insured. (R. at 21-25.)

The ALJ found Hamm had the residual functional capacity to perform simple, routine, sedentary[4] work, except he could frequently, but not constantly, perform reaching, handling and fingering, bilaterally; he could perform no overhead reaching; he could occasionally interact with the public, supervisors and co-workers; he could follow short, simple instructions and complete a full workday with ordinary employer-provided breaks at approximately two-hour intervals; and he could deal with routine work situations.  (R. at 25.) The ALJ found Hamm was unable to perform any past relevant work through the date last insured. (R. at 35.) However, based on Hamm's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hamm could perform, including the jobs of a document preparer, an addressing clerk and a weight tester. (R. at 36, 74-76.) Thus, the ALJ concluded Hamm was not under a disability as defined by the Act, and he was not eligible for DIB benefits. (R. at 37.) *See* 20 C.F.R. § 404.1520(g) (2021).

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2021).

After the ALJ issued his decision, Hamm pursued his administrative appeals, (R. at 180-81, 323-24), but the Appeals Council denied his request for review. (R. at 1-6.) Hamm then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Hamm's motion for summary judgment filed October 5, 2021, and the Commissioner's motion for summary judgment filed October 26, 2021.

## II. Facts

Hamm was born in 1973, (R. at 187), which, at the time of the alleged onset date and date last insured, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and armed security training. (R. at 281.) Hamm has past work experience as a security guard and a material handler.[5] (R. at 73.) He served in the Marine Corps in active-duty service from 1992 to 1996. (R. at 26, 220.) Hamm testified at his hearing that he had undergone surgeries on both shoulders prior to 2013. (R. at 51.) Specifically, he had a torn right rotator cuff repaired in 2009, and a torn left biceps tendon repaired in 2013. (R. at 50-51, 53.) In 2014, some of the hardware from the biceps tendon surgery loosened, and had to be removed. (R. at 50-51.) He said he continued to have issues with both shoulders during the period relevant to his claim, including pain, decreased range of motion, numbness, tingling and "pins and needles" in the fingers, grip loss and, with regard to the left arm, he was unable to lift any weight at all. (R. at 51-54.) Hamm also testified he had difficulty using his upper extremities for overhead activities during

---

[5] The vocational expert classified the security guard job as semi-skilled and light, and the material handler job as semi-skilled and heavy. (R. at 73.)

the relevant period.  (R. at 54.)  He also stated he was unable to use his arms at tabletop or chest level to feel, manipulate or lift/carry, noting that, during the time relevant to his claim, he could not carry anything over 10 pounds. (R. at 54-55.)  He said the Veterans Administration had conducted an impairment rating on his upper extremities, finding he could not lift anything over 10 pounds with either arm.  (R. at 55.)  Hamm testified he also could not lift/carry 10 pounds occasionally due to shoulder, neck and back pain.  (R. at 55-56.)  He said, during the relevant time period, he could use his hands repetitively for five to 10 minutes before having numbness, "pins and needles" and grip loss.  (R. at 56-57.)

Hamm testified he began experiencing neck pain before he left the Marine Corps in 1996.  (R. at 57-58.)  Hamm stated his neck pain was "extremely more severe" than his shoulder pain, but it radiated into his shoulder and arms, as well as up into his head, causing severe headaches, which he was having during the time relevant to his claim.  (R. at 58-59.)  He also stated he had low back pain four to five times weekly during this time from the sciatic nerve on the left side, requiring him to lie down or stand in a hot shower for pain relief.  (R. at 59.)   Hamm further testified that, prior to his date last insured, he was having bilateral knee pain, for which he underwent three sets of injections, which helped, but did not completely alleviate the pain.  (R. at 60-61.)  He said he could stand or walk for about 10 minutes before having to sit or lie down due to pain.  (R. at 61-62.)  He stated the VA would not give him pain medication because he is an opiate addict;[6] however, he has self-medicated with marijuana and used over-the-counter pain medication, a TENS unit, heat and cold, analgesics and multiple courses of physical therapy.  (R. at 62.)

---

[6] Hamm testified he underwent a one-year, inpatient VA program for opiate addiction from 2007 to 2008.  (R. at 63.)

Hamm stated that, prior to his date last insured, he had difficulty sitting, squatting, bending and kneeling, and he would not have been able to perform these activities occasionally in 2013. (R. at 62-63.)

Hamm also testified he had been treated for depression, anxiety and PTSD since 2008 and was having four to five anxiety attacks weekly, despite being medicated for anxiety during the relevant time. (R. at 64.) He also testified to having five to six nightmares weekly during that time related to his combat in Somalia. (R. at 64.) Hamm testified he had a service-connected PTSD claim. (R. at 64.) He stated that he tried to avoid contact with the outside world "a lot" because he sometimes did not know what would trigger his PTSD. (R. at 64-65.) He said, during the time relevant to his claim, he was having three or four crying spells weekly, he did not want to get out of bed, he wanted to sleep all the time, he did not want to eat, and he did not want to do anything. (R. at 65-66.) Hamm testified he also experienced anger and participated in anger management during the relevant period, noting he was fired from a job because he "pinned the supervisor against the wall." (R. at 66.) Hamm stated he had other confrontations with fellow employees in the past, but only had issues with authority figures "when they triggered [him]." (R. at 66-67.) He stated prior to stopping working, he was missing three to four days monthly, as well as going in late and leaving early at times. (R. at 68.) Although Hamm tried to return to an unarmed security guard job in 2016, this lasted only about three to five months because he had to sit down after walking for about 10 minutes, and after about an hour and a half of his shift, he no longer was able to make patrols due to pain. (R. at 68-69.)

In rendering his decision, the ALJ reviewed records from Dr. Nicolas Tulou, M.D., a state agency physician; Jo McClain, Psy.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Veterans Affairs Medical Center, ("VAMC"), – North Chicago; VAMC – Mountain Home; Holston Valley Medical Center; MSMG – Internal Medicine; Indian Path Medical Center; Kristin L. Grant, Psy.D., a licensed clinical psychologist; Dr. Robert A. Blaine, M.D.; James H. Quillen VAMC; and Rachel Stout Cunningham, F.N.P., a family nurse practitioner.

## A. Physical Impairments

### i.    Neck & Upper Extremity Impairments

An August 13, 2007, x-ray of Hamm's cervical spine showed very early spondylosis at the C6-C7 level.  (R. at 1069.)  He underwent right shoulder surgery to repair an anterior labral tear in September 2009. (R. at 632.)  On November 10, 2011, Hamm complained to a chiropractor at the VA of neck pain and headaches after being involved in a recent motor vehicle accident, in which he was a passenger in a vehicle that was "t-boned and [he] took the impact in [his] door."  (R. at 820-21.)  Imaging of his cervical spine from October 13, 2011, showed possible mild neural foraminal narrowing at the lower levels.  (R. at 877.)  On May 21, 2012, Hamm reported to Dr. Susanne Toyne, M.D., during a primary care visit to the VA, that his left shoulder was "locking up" like his right shoulder had before requiring surgery.  (R. at 632.)  Dr. Toyne also noted Hamm needed a consultation for his neck.  (R. at 632.)  Physical examination revealed a moderately decreased range of motion of the neck, but Hamm was able to lie directly back on the exam table.  (R. at 633.)  On July 11, 2012, during an orthopedic surgery consult at the VA with Dr. Judson McGowan, M.D., for continuous left shoulder pain, Hamm had decreased

active range of motion and tenderness to palpation of the left shoulder, but no obvious increase in muscle atrophy and no neurological abnormalities. (R. at 626-28.) Hamm was discharged from the orthopedic clinic and referred to physical therapy. (R. at 626-27.) He also was instructed in a home exercise program. (R. at 626.) When he returned to his primary care doctor at the VA, on January 23, 2013, Hamm continued to complain of left shoulder pain. (R. at 616-17.) He reported having sole custody of his one-year-old daughter at that time. (R. at 617.) That same day, Hamm also saw Dr. Charles Barnes, M.D., an orthopedic surgeon at the VA, for a consultation regarding his left shoulder pain with numbness and tingling in his fingers. (R. at 615.) On examination, Hamm had some decreased range of motion and pain in the left shoulder, but he retained full strength. (R. at 615.) Dr. Barnes noted an MRI of the left shoulder showed a partial rotator cuff tear, for which he administered a steroid injection and scheduled Hamm for surgery. (R. at 615.) Hamm saw Shelley Silvers, Psy.D., a clinical psychologist, for a pain psychology evaluation in February 2013, but he did not return for a second appointment in April 2013. (R. at 611.) In February 2013, he was accompanied to the appointment by his 13-month-old daughter, and he advised Silvers he was her primary caregiver. (R. at 611.) Hamm also advised he last worked 19 months previously as a security guard at a construction site, but the job ended due to "downsizing of the workforce." (R. at 611.)

On July 10, 2013, Hamm underwent an arthroscopy of the left shoulder with subacromial decompression and biceps long head tenodesis, which he tolerated well. (R. at 645-47.) Dr. Barnes's post-operative diagnoses of Hamm were left shoulder

subacromial impingement syndrome; and type II SLAP lesion[7] of the left shoulder. (R. at 646.)  On July 15, 2013, Hamm reported being in a great deal of pain after having a nightmare the prior night and raising his left arm over his head.  (R. at 583.) There also was some edema of the left upper extremity down to the hand, and Hamm had some decreased range of motion.  (R. at 583.)  He was referred to begin physical therapy.  (R. at 584.)  At an orthopedic post-operative follow-up appointment on July 22, 2013, Hamm reported his pain had been reasonably well-controlled with medications.  (R. at 582.)  At a six-week orthopedic follow up, on August 28, 2013, Hamm was doing well, although the left shoulder was "still somewhat stiff."  (R. at 578.)  Continued physical therapy to work on range of motion was recommended, to slowly progress to biceps strengthening, beginning with two to three pounds.  (R. at 578.)  On September 5, 2013, it was noted that Hamm missed a second physical therapy appointment.  (R. at 577-78.)  When Hamm returned to Dr. Barnes on January 22, 2014, he noted he had fallen on his outstretched left upper extremity since his July 2013 surgery.  (R. at 577.)  He reported he stopped physical therapy early because he could not afford gas, and he reported pain at that time.  (R. at 577.) Dr. Barnes ordered an MRI and x-rays of the left shoulder.  (R. at 577.)  These x-rays, dated February 22, 2014, showed no fracture or dislocation.  (R. at 551.)  At another appointment with Dr. Barnes, on April 23, 2014, it was noted Hamm's fall occurred about two months after the July 2013 surgery.  (R. at 519.)  Hamm reported continued left shoulder pain, difficulty with overhead activity and pain at night.  (R. at 519.)  Dr. Barnes noted MRI findings showing Hamm's biceps tenodesis screw was dislodged from the humerus, as well as a possible rotator cuff tear, for which he

---

[7] A SLAP lesion is a superior labrum from anterior to posterior tear and generally occurs as a result of overuse injury to the shoulder or traumatic fall.  A type II SLAP lesion indicates labral fraying with detached biceps tendon anchor.  SLAP lesions are classified I through X.  *See* orthobullets.com/shoulder-and-elbow/3053/slap-lesion (last visited Sept. 29, 2022).

recommended surgical repair.  (R. at 519.)  On August 13, 2014, Hamm underwent an arthroscopy of the left shoulder with debridement of the subacromial space and removal of a biotenodesis screw.  (R. at 489.)  Meanwhile, x-rays of Hamm's right shoulder, dated March 20, 2014, showed only mild degenerative changes.  (R. at 553.)

While physical examinations during the relevant period showed some loss of range of motion, pain and/or tenderness in the neck and left shoulder, Hamm, otherwise, exhibited 5/5 rotator cuff strength in the left shoulder and no obvious neurological deficits, such as decreased sensation or reflexes.  (R. at 577, 615, 628, 633.)  At a primary care visit at the VA on May 28, 2015, he reported cervical pain that radiated into the thoracic regions and across the upper back, with some radicular pain in the right upper extremity and a compressive sensation in the shoulder, then numbness traveling down the arm followed by "pins and needles" in the forearm and hand.  (R. at 468.)  Hamm noted this pain might be precipitated by activities like using a weed eater, reaching to grab objects or working on an automobile.  (R. at 468.)

### ii.    *Back and Lower Extremity Impairments*

On January 23, 2013, when Hamm saw Dr. Toyne for a primary care appointment at the VA, he complained of sharp and burning knee pain two to three times a month, which was worse when getting up and down.  (R. at 617.)  He also reported his knees would get "stuck."  (R. at 617.)  Hamm stated he could "handle" his back.  (R. at 617.)  He reported he was looking for a job, but he could not do "anything physical."  (R. at 617.)  Hamm reported he owned his home, and he "does the yard."  (R. at 618.)  The only musculoskeletal finding on examination was that

Hamm's spine was straight.  (R. at 619.)  X-rays of Hamm's knees from January 2010 showed no significant bony abnormality.  (R. at 536-38.)  Likewise, an MRI of the left knee from January 2010 was unremarkable.  (R. at 538-39.)  X-rays of Hamm's lumbosacral spine, dated October 13, 2011, revealed no abnormality, including no evidence of spondylosis.  (R. at 877-78.)  At a chiropractic consult in November 2011, Hamm reported mid-lumbar pain with resolving sciatic nerve pain. (R. at 820.)   On examination, he was described as being in good physical conditioning, and he had erect posture with a steady gait, coordinated global movements and coordinated transitioning.  (R. at 820.)  Hamm had decreased lumbar and cervical spine range of motion.  (R. at 820.)  On May 21, 2012, at a primary care appointment at the VA, Hamm reported that chiropractic treatment resulted in two to three weeks of low back pain relief.  (R. at 632.)  Examination showed Hamm's spine was straight; he was able to lie back directly on the exam table; he was in no acute distress; he lounged in a chair; and he was moving well.  (R. at 633.)  Hamm missed chiropractic appointments on June 14, July 25 and August 1, 2012.  (R. at 625, 629.)  In January 2013, although Hamm complained of low back pain and knee pain to his primary care provider at the VA, no significant findings were noted on examination.  (R. at 616, 618-19.)  In February 2013, when Hamm was seen for a chronic pain evaluation, psychologist Silvers stated he "ambulated independently and carried his daughter on his [right] hip."  (R. at 612.)   Although Hamm complained of right hip/groin and right leg pain when he presented to the emergency department at the VA on February 21, 2014, his gait was steady on examination.  (R. at 561-62.)  A CT scan of Hamm's lumbar spine, dated June 23, 2014, showed a possible, broad-based annular bulge at the L4-L5 level with no spinal stenosis, as well as well-maintained disc spaces, vertebral body heights and alignment.  (R. at 721.)

### iii. VA Disability Rating Examinations

On March 20, 2014, Hamm underwent a VA disability rating examination regarding his knee and lower leg conditions by Dr. Jo Gordon Sweet, M.D. (R. at 528-42.) Hamm reported a long history of knee problems, including a right ACL repair at age 14, as well as a re-injury of the right knee during his military service in 1993. (R. at 530.) Hamm did not recall a specific left knee injury, but he reported pain in both knees while in the military, although he did not receive treatment during that time, as it generally was discouraged. (R. at 530.) During a military separation exam in 1996, Hamm was noted to have had chronic knee pain throughout his military career. (R. at 530.) He advised the VA rating examiner he had received multiple rounds of injections to both knees, and he wore braces on both knees, but he continued to have knee pain, which he rated a nine on a 10-point scale, bilaterally. (R. at 530.) On examination, Dr. Sweet noted an extensive skin graft over the right knee. (R. at 535.) He had knee flexion to 125 degrees with pain, bilaterally, but extension was normal. (R. at 531-32.) Hamm achieved the same range of motion values after three repetitions. (R. at 532-33.) He exhibited tenderness to palpation in the right knee. (R. at 533.) Hamm's flexion strength, bilaterally, was 4/5, but his extension strength was 5/5, bilaterally, and there was no sign of instability in either knee. (R. at 533-34.) Dr. Sweet also reviewed multiple unremarkable imaging studies of Hamm's knees from 2010. (R. at 536-40.) Dr. Sweet opined that, due to Hamm's significant knee pain, he could be employed only in a sedentary position for two to three hours at a time. (R. at 540.)

Also on March 20, 2014, Hamm underwent a VA disability rating examination regarding his shoulder and arm conditions by Dr. Sweet. (R. at 542-54.) Hamm noted the August 2009 right rotator cuff repair surgery and the July

2013 detached biceps tendon repair, from which Dr. Sweet noted he had residuals in both shoulders. (R. at 543, 549-50.)  Hamm currently complained of an "arthritic," dull pain in his right shoulder, which he rated as a five on a 10-point scale, and almost continuous pain reaching a nine on a 10-point scale in his left arm. (R. at 543.)  Examination of the right shoulder showed flexion to 150 degrees without pain and abduction to 135 degrees with pain. (R. at 544-45.)  Examination of the left shoulder showed flexion to 125 degrees with pain and abduction to 90 degrees with pain. (R. at 545.)  These values decreased slightly after three repetitions.[8] (R. at 546.)  Hamm exhibited tenderness and guarding in the left shoulder. (R. at 547.)  Shoulder strength was 3/5 on the left and 4/5 on the right. (R. at 547-48.)  Hawkins impingement test was positive, bilaterally, and empty can test was positive on the left. (R. at 548.)  External rotation/infraspinatus strength test was positive, bilaterally, and lift-off subscapularis test was positive on the left. (R. at 548.)  Hamm exhibited tenderness to palpation of the acromioclavicular, ("AC"), joint on the left. (R. at 549.)  Dr. Sweet reviewed diagnostic imaging of the left shoulder from February 2014, which showed no fracture or dislocation and a normal AC joint. (R. at 550-51.)  He also reviewed a May 2008 MRI of Hamm's right shoulder, which showed a small, partial-thickness tear of the supraspinatus tendon. (R. at 552.)  March 2014 x-rays of the right shoulder showed only mild degenerative changes. (R. at 553.)  An April 2014 MRI of the left shoulder showed disrupted biceps tenodesis with long head tendon stump and dislodged screw anchor abutting the

---

[8] On July 23, 2014, Dr. Sweet entered an addendum to his note, indicating that these shoulder range of motion values were erroneously performed, and an appointment had been scheduled for proper measurement techniques to be employed. (R. at 557.)  On August 4, 2014, Dr. Sweet indicated the following revised values: right shoulder external rotation to 65 degrees (60 degrees after three repetitions) and internal rotation to 35 degrees (40 degrees after three repetitions); left shoulder external rotation to 35 degrees (50 degrees after three repetitions) and internal rotation to 25 degrees (20 degrees after three repetitions). (R. at 558.)  It does not appear, however, that Dr. Sweet revised the opinion as to Hamm's lifting limitations.

humerus, and a partial tear of the distal supraspinatus-infraspinatus conjoined tendon with suggestion of full-thickness involvement, but no gross tendon gap or retracted tendon stump, among other findings. (R. at 556.) Dr. Sweet opined that, due to severe left shoulder pain, Hamm could not lift anything with the left shoulder, but he could lift up to 20 pounds with the right shoulder. (R. at 554.)

### iv. Medical Source Statement

On October 19, 2020, Rachel Stout Cunningham, F.N.P., a family nurse practitioner, completed a work-related physical assessment, finding Hamm could lift/carry five pounds occasionally and 10 pounds frequently; stand/walk a total of 10 to 15 minutes in an eight-hour workday; sit for 30 minutes to an hour without interruption; never climb, stoop, kneel, balance, crouch or crawl; his abilities to reach, to handle and to feel were limited; his ability to work around moving machinery, temperature extremes, chemicals, dust, noise, fumes and vibration were limited; and he would be absent from work more than two days monthly. (R. at 1527-29.) Cunningham supported her findings with Hamm's degenerative disc disease and degenerative joint disease, confirmed by imaging; his reports of difficulty lifting; and his reports of pain. (R. at 1527-29.)

### B. Mental Impairments

#### i. Primary Care Treatment

In May 2015, at a primary care appointment at the VA, Dr. Beth Troum, M.D. noted that Hamm had not been seen since January 2013. (R. at 467.) Hamm reported his father's death in January and that he would cry spontaneously, but this was ongoing for several years and was no worse. (R. at 468.) He reported chronic, poor sleep; increased stress; pain; and anxiety. (R. at 468.) Hamm reported taking

melatonin for sleep for years with questionable benefit, but he declined a referral for insomnia due to transportation issues.  (R. at 468.)  A PTSD screen was positive, but Hamm did not desire assistance from mental health.  (R. at 472.)  Dr. Troum diagnosed a mood disorder, for which she offered to prescribe anti-depressant medication, but Hamm declined.  (R. at 472.)  He agreed, however, to a trial of Zoloft to decrease agitation and anxiety.  (R. at 468, 472.)  As stated above, on July 15, 2013, Hamm reported having a nightmare, and in August 2013, Hamm reported a similar issue during a visit with physical medicine and rehabilitation at the VA.  (R. at 579, 583.)  Specifically, he indicated regularly rolling on his shoulder during the night and thrashing his left upper extremity in his sleep.  (R. at 579.)  However, Hamm had not mentioned any significant psychiatric complaints to Dr. Toyne in May 2012, and on examination, he was alert and fully oriented, well-groomed and had a normal affect.  (R. at 631-33.)  Likewise, at another primary care visit in January 2013, a depression screening was negative, and Hamm had a normal attention span and memory.  (R. at 620-22.)  He was alert and fully oriented, appropriately dressed, neat and well-groomed and had a normal affect.  (R. at 619.)  Hamm saw psychologist Silvers on February 25, 2013, for a pain psychology consultation, at which time he reported a history of inpatient substance abuse treatment at the VA in 2008.  (R. at 612.)  However, Hamm denied any current mental health treatment.  (R. at 612.)  Silvers stated Hamm arrived to the evaluation on time, he was casually dressed and neatly groomed, he was cooperative with the interview process, and he answered all questions asked of him.  (R. at 612.)  Although he was often distracted by his 13-month-old daughter, who accompanied him, Hamm's thought processes were organized and goal-directed, and there was no evidence of an active thought or perceptual disorder.  (R. at 612.)  Moreover, despite having a mildly anxious affect, Hamm maintained good eye contact and normal

speech.  (R. at 612.)  In July 2013, during a pre-surgical clearance appointment, Hamm denied PTSD, depression, anxiety and psychosis, and he was alert and fully oriented.  (R. at 610.)

## *ii. Consultative Psychological Evaluation*

On December 13, 2016, Hamm underwent a psychological evaluation by Kristin L. Grant, Psy.D., a licensed clinical psychologist, at the request of Disability Determination Services, in connection with his prior DIB claim.  (R. at 734-38.)  He was dressed appropriately and neatly groomed, but his hygiene was poor.  (R. at 734.)  He reported consuming alcohol heavily for 15 years; using marijuana "every time I can get it;" and previously using pain pills and cocaine.  (R. at 735.)  Hamm stated he had attended substance abuse rehabilitation on three occasions.  (R. at 735.)  Although he denied undergoing any inpatient or outpatient mental health treatment, he said he had been prescribed psychiatric medications for depression through his primary care provider at the VA, and he stated Zoloft helped.  (R. at 736.)  He said he also had been diagnosed with PTSD. (R. at 736.)  Hamm admitted to both fleeting homicidal and suicidal ideations, but with no intent or plan.  (R. at 736.)  He denied hallucinations, but Grant noted he appeared to be experiencing delusional thinking, as he felt people, in general, were not to be trusted.  (R. at 736.)  Hamm reported vivid nightmares, during which he relived trauma.  (R. at 736.)  He described his mood over the prior month as depressed, anxious, irritable and angry, and he reported racing thoughts, hypervigilance, very low energy, low motivation, no interest in things as well as difficulty with focus, concentration and thinking clearly due to pain.  (R. at 736.)  Hamm stated he left his house only to take his daughter to school, to grocery shop and to attend appointments. (R. at 736.)  He reported regular panic attacks, manageable by distracting himself, as well as crying spells that came

"out of the blue." (R. at 736.)  Hamm reported he managed his medications and his finances with little or no difficulty; he could prepare simple meals; he could sweep; he had not been able to do yard work; he had a driver's license and drove locally three times weekly, but stayed off major roads and interstates due to severe road rage; he had no hobbies, although he used to hunt, fish and go to the shooting range; his main social supports were his mother and his ex-wife; and he did not belong to a church or social organization.  (R. at 738.)

On mental status examination, Hamm was alert and fully oriented; eye contact was fair; speech was pressured, but of normal clarity and volume; responses were coherent and easy to understand; thought processes were clear and logical, but with paranoia with trust issues; he was cooperative and candid; mood was depressed, anxious and irritable, with a congruent and blunted affect; he gave a reasonable amount of effort; he could recall three of three named items immediately after presentation; he successfully completed Serial 3s; he performed well in the digit span tasks; he correctly spelled "world" forward and backward; he recalled only one of three previously named objects after three minutes; he correctly recalled his birthdate and his Social Security number; he easily named four recent U.S. Presidents; he appeared able to follow both written and spoken instructions; he showed good use of basic vocabulary and good basic math skills; and he showed a good capacity for abstract thinking and understanding.  (R. at 736-37.)

Grant opined Hamm showed no evidence of malingering, and he was functioning in the average range of intelligence.  (R. at 737.)  She found his current psychiatric state was depressed, anxious, panicked, irritable and angry.  (R. at 738.)  Grant diagnosed Hamm with PTSD; panic disorder; and major depressive disorder,

recurrent, moderate, among other things.  (R. at 738.)  She opined he was moderately impaired in short-term memory and ability to sustain concentration, but had no impairment in his long-term memory and remote memory functioning.  (R. at 737.) Grant found Hamm had significant difficulty with authority, noting his longest span of employment was two years, and he had been fired twice.  (R. at 737.)  She opined he was markedly impaired in social relating and in his ability to adapt to change; he could follow both written and spoken instructions; he had significant difficulty with authority; and he could handle his finances and would manage any funds awarded to him.  (R. at 738.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hamm argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Hamm argues the ALJ erred by improperly considering the opinions of Dr. Sweet, psychologist Grant and nurse practitioner Cunningham. (Plaintiff's Brief at 5-6.)

Hamm filed his current application in July 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[9] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he

---

[9] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[10] *See* 20 C.F.R. § 404.1520c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found Hamm had the residual functional capacity to perform simple, routine, sedentary work, except he could frequently, but not constantly, perform reaching, handling and fingering, bilaterally; he could perform no overhead reaching; he could occasionally

---

[10] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

interact with the public, supervisors and co-workers; he could follow short, simple instructions and complete a full workday with ordinary employer-provided breaks at approximately two-hour intervals; and he could deal with routine work situations. (R. at 25.)

Hamm states in his brief that he has a service-connected disability rating of 80 percent due to PTSD, limited motion of his arms, limited flexion of his knees, tinnitus, intervertebral disc syndrome and sciatic nerve paralysis. (Plaintiff's Brief at 5.) However, it is well-settled, and the ALJ stated in his decision, that decisions by other governmental agencies and statements on issues reserved to the Commissioner are considered neither valuable nor persuasive under the regulations. (R. at 31); *see* 20 C.F.R. § 404.1520b(c)(1) and (3) (2021). The ALJ further stated, however, that the opinions of medical providers that may form the basis of such ratings should be considered, and he did just that. (R. at 32-33.) In his brief, Hamm references only the VA disability examination related to his neck and upper extremity impairments. (Plaintiff's Brief at 5.) Thus, the court will limit the following discussion thereto, and for the reasons that follow, I find the ALJ considered the examiner's resulting opinion in accordance with the regulations.[11]

The ALJ found Dr. Sweet's March 2014 opinion that Hamm was unable to lift anything with his left shoulder unpersuasive. (R. at 33.) Specifically, he stated that a finding of absolutely no lifting was overstated, even relative to Dr. Sweet's

---

[11] The undersigned notes that, although this examination was performed approximately three months after the expiration of Hamm's date last insured, it was close enough in time to that date so as to, arguably, provide relevant information regarding Hamm's condition at the time of his date last insured. Moreover, because the ALJ considered this examination in reaching his disability determination, and because Hamm notes in his brief the examiner's resulting opinion as to his ability to lift, the undersigned also will consider it.

objective findings, which included decreased range of motion, tenderness and guarding and decreased strength.  (R. at 33, 544-45, 547-48.)  Thus, the ALJ made the requisite finding as to supportability under the regulations.  The ALJ also found Dr. Sweet's opinion was not consistent with the other evidence of record, which included findings through January 2014 of full rotator cuff strength and fairly mild range of motion deficits.  (R. at 33, 577, 615.)  Prior to discontinuing physical therapy in late 2013, it was noted that Hamm was making good progress before falling on his outstretched left upper extremity in January 2014.  (R. at 33, 577-78.)  Thus, I find the ALJ's consideration of Dr. Sweet's opinion was in accordance with the regulations and is supported by substantial evidence.

Hamm also argues the ALJ improperly considered the October 2020 opinion of nurse practitioner Cunningham, finding that he was not capable of performing a full eight-hour workday at any level of exertion due to degenerative disc disease and degenerative joint disease, resulting in difficulty lifting and pain.  (R. at 1527-29.) Cunningham also opined Hamm would be absent more than two workdays monthly. (R. at 1529.)  The ALJ found his opinion unpersuasive through the date last insured. (R. at 35.)  Specifically, he correctly stated that the extreme limitations contained in Cunningham's assessment were not well-supported, as they appeared to rely on imaging and Hamm's self-reports many years after the expiration of the date last insured.  (R. at 35.)  The court notes that Cunningham's opinion was rendered nearly seven years after the expiration of Hamm's date last insured, and there is nothing contained in the assessment to relate the findings contained therein back to the time relevant to Hamm's claim.  Additionally, the ALJ found Cunningham's limitations inconsistent with the other evidence of record through the date last insured, including his comfortable appearance during a primary care visit in May 2012, despite his

complaints of pain, (R. at 35, 633), and his ability to walk while carrying his infant daughter on his hip during a February 2013 pain consultation. (R. at 35, 612.) I find the ALJ's consideration of Cunningham's opinion was in accordance with the regulations and is supported by substantial evidence.

Lastly, Hamm argues the ALJ erred in his consideration of the December 2016 consultative psychological evaluation performed by Grant in connection with his prior DIB application. Grant opined that Hamm had significant difficulty with authority; that he was moderately impaired in his short-term memory and ability to sustain concentration; and that he was markedly impaired in his social relating and ability to adapt to change. (R. at 737-38.) The ALJ correctly found Grant's opinion unpersuasive with respect to the relevant period at issue.[12] (R. at 34.) Nonetheless, the ALJ proceeded to assess the supportability and consistency of Grant's opinion under the regulations. In particular, the ALJ found it "not entirely supported" because the proposed limitations were disproportionate to Hamm's objective clinical presentation, which included pressured speech and some paranoid thinking, as well as a depressed, anxious and irritable mood, with a congruent and blunted affect, but otherwise normal findings, including fair eye contact, coherent speech of normal volume, clear and logical thought processes and intact immediate recall. (R. at 34, 736-37.) Hamm also successfully performed Serial 3s, completed digit span testing,

---

[12] This evaluation was conducted in December 2016, approximately three years after the expiration of Hamm's date last insured. Although it was a consultative examination, performed at the request of Disability Determination Services, there is no indication the evaluation was for the period of time from July 2011 through December 2013. In fact, Grant noted that, in addition to VA records, she considered a November 2016 Function Report. (R. at 734.) There is no reason to believe the information contained in this Function Report related back to the time relevant to Hamm's claim and, in fact, a review of it appears to indicate it was a current report of his functioning. (R. at 271-78.) Moreover, it is clear that the mental status examination was of Hamm's current state, and Grant stated in her report that Hamm's "*current* psychiatric state was depressed, anxious, panicked, irritable and angry." (R. at 738) (emphasis added).

spelled "world" both forward and backward, recalled one of three items after three minutes, recalled his own Social Security number and other basic facts, showed good use of basic vocabulary, good basic math skills and a good capacity for abstract thinking and understanding, and he was cooperative throughout the interview.  (R. at 34, 736-37.)  Additionally, Hamm advised Grant he got some relief from his anti-depressant medication.  (R. at 34, 736.)  The ALJ further found Grant's opinions were inconsistent with the other evidence of record, which he correctly stated showed Hamm's mental status was grossly intact over the relevant period, despite not receiving mental health treatment at that time. (R. at 34, 612, 619, 633.)  Thus, I find the ALJ's consideration of Grant's opinion was in accordance with the regulations and supported by substantial evidence.

For the reasons stated herein, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:        September 30, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-24-